The **SHERWIN–WILLIAMS COMPANY, Plaintiff,**

v.

The **CITY OF HAMTRAMCK, Freezer Services of Michigan, Edward Stillman, Paul Seegott, The Estate of S. Michael Loveman, and Stillman–Seegott Partnership, Defendants.**

Civ. A. No. 93–70082.

United States District Court, E.D. Michigan, S.D.

Dec. 22, 1993.

Jeffrey K. Haynes, Vanderkloot, Rentrop, Martin, Haynes & Morrison, Bloomfield Hills, MI, for Paul Seegott.

Timothy H. Howlett, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, for S. Michael Loveman.

James E. Baiers, Clark, Klein & Beaumont, Detroit, MI, Susan J. Sadler, Sherwin E. Zamber, Clark, Klein & Beaumont, Bloomfield, MI, for Sherwin Williams Co.

James D. Robb, Miller Canfield, Paddock & Stone, Detroit, MI, for Hamtramck City.

Robert A. Fineman, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Freezer Services of Michigan.

Joseph P. Garin, Lipson, Neilson, Jacobs, Cole & Litt, P.C., Troy, MI, for Diversified Chemical.

## MEMORANDUM OPINION AND ORDER

GADOLA, District Judge.

Plaintiff Sherwin–Williams Company has brought this action seeking a declaratory judgment that cleanup costs incurred by the City of Hamtramck ("the City") are not recoverable under the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9626, and the Michigan Environmental Response Act ("MERA"), Mich.Con. Laws Ann. §§ 299.601–.618. Before the court is plaintiff's motion for summary judgment on its claim for declaratory relief and on the City's counter-claim. For the reasons discussed below, the court will grant in part and deny in part plaintiff's motion.

### I. Background

This action arises out of the ownership of a parcel of property located at 8250 St. Aubin Street in the City of Hamtramck, Michigan ("the Site"). Prior to 1978 the property was owned by plaintiff Sherwin–Williams. In 1978, Sherwin–Williams transferred title to defendants Edward Stillman and Paul Seegott, who later formed a partnership with S. Michael Loveman for the purpose of sharing profits from the property. In 1982, the property was sold to defendant City. The City owned the property until August 30, 1985, when it was sold to defendant Freezer Services, the current owner.

Soon after acquiring title, Freezer Services discovered contamination and buried debris during excavation of the soil for construction of a refrigerated warehouse. Freezer Services sued the City and others, claiming in part breach of warranty as to the condition of the property. Freezer Services and the City eventually reached a settlement whereby the City agreed to excavate and dispose of the contaminated soil and debris. Since that time, the City has allegedly incurred substantial costs in excavating and disposing of the soil and debris.

The Site at issue was owned by Sherwin–Williams for some seventy years, during which time it operated a paint manufacturing facility. The City alleges that the company discharged paint and other materials into the soil. Upon discovery of the alleged contamination, Freezer Services notified an officer of the Michigan Department of Natural Resources ("MDNR") in June 1986, who concluded that Freezer Services could continue with construction. In August 1986, tests were performed on samples taken from the old building foundation and from the stockpile of soil that was accumulating during the continuing construction. The results of the tests were forwarded to the MDNR, and the City requested guidance on the proper disposal of the soil stockpile.

Construction on the Freezer Services site was divided into two phases. During the first phase, construction of the main warehouse would be completed. The second phase involved the construction of an addition that involved further excavation and stockpiling of soil. By October 1990, the City had removed the soil stockpile from the first phase of construction on the Site. The stockpile was disposed of it in a licensed landfill with MDNR approval. Also in October 1990, the City submitted to the MDNR a work plan for remediation of the site of the warehouse addition involved in the second phase of the operation. The plan called for the stockpiling and testing of soil from the excavation on site. After consultations with the MDNR, the MDNR approved the amended remediation plan for the addition in January 1991.

In March 1991, the MDNR notified Sherwin–Williams that it was a potentially responsible party under MERA. In September 1992, the City was authorized by the MDNR to remove the second stockpile from the site. Because of a lack of funds, the City has not completed removal of the stockpile. After more than a year of discussions with Sherwin–Williams, the City filed an action for recovery of its cleanup costs in state court on January 8, 1993. Sherwin–Williams filed its complaint seeking declaratory relief in this court on the same day.

In its motion for summary judgment, Sherwin–Williams claims that the City cannot recover its response costs under CERCLA. Sherwin–Williams also argues that if the City cannot recover under CERCLA, then it also cannot recover under MERA. Because both sides argue merely the recoverability of costs

under CERCLA and not MERA, the court will not decide whether Sherwin–Williams is liable under MERA. Sherwin–Williams contends that the City cannot recover under CERCLA because the costs it incurred in remediating the Site were inconsistent with the National Contingency Plan ("NCP"). As a result, Sherwin–Williams is seeking summary judgment on its claim for declaratory relief and on the City's counter-claim for recovery of costs under CERCLA and MERA.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (citation omitted) (quoting Black's Law Dictionary 881 (6th ed. 1979)). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Cel-*

*otex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd,* 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

## III. Analysis

Sherwin–Williams is seeking a declaratory judgment that it is not liable for the response costs incurred by the City in the cleanup of the Freezer Services site under CERCLA. The City has filed a counter-complaint for recovery of costs, and Sherwin–Williams is also seeking summary judgment on the counter-complaint.

## A. CERCLA Actions

CERCLA was enacted by Congress in 1980 in order to provide for the cleanup of hazardous waste sites. *Exxon Corp. v. Hunt,* 475 U.S. 355, 359–60, 106 S.Ct. 1103, 1107–08, 89 L.Ed.2d 364 (1986). Private and government plaintiffs can recover the costs that they incur in remedying hazardous sites through an action under 42 U.S.C. § 9607(a) against the parties responsible for the contamination. In order to recover its costs under section 9607(a), a party must show that:

> (1) the defendant is a "covered person" within the meaning of the act; (2) a "release" or "threatened release" of any "hazardous substance" from the site in question has occurred; (3) the release or threatened release caused plaintiff to incur costs; (4) plaintiff's costs are "necessary" costs of response; and (5) plaintiff's response actions were consistent with the NCP.

*Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.,* 748 F.Supp. 373, 381 (E.D.N.C. 1990) (citing *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1278–79 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988)). Sherwin–Williams claims that because the City's response actions were inconsistent with the NCP, it deserves declaratory relief.

## B. Burden of Proof

■ Before considering whether the City's actions were consistent with the NCP, the court must decide which party has the burden to establish compliance or noncompliance with the NCP. CERCLA provides that responsible parties may be liable for the following costs:

> (A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a)(4)(A)–(B). In an action by the federal government or a state under section 9607(a)(4)(A), the burden is on the responsible party to show that the actions of the federal government or state were inconsistent with the NCP. *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726, 746 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *City of Philadelphia v. Stepan Chemical Co.,* 713 F.Supp. 1484, 1486 (E.D.Pa.1989). In cases brought by "any other person" under section 9607(a)(4)(B), however, it is an element of the prima facie case of the party seeking recovery of costs that the costs incurred were consistent with the NCP. *Northeastern Pharmaceutical,* 810 F.2d at 747; *Stepan Chemical,* 713 F.Supp. at 1486–87.

■ The City contends that it is a "state" for purposes of section 9607. It relies on *Mayor & Board of Aldermen of Boonton v. Drew Chemical Corp.,* 621 F.Supp. 663 (D.N.J.1985), which held that actions by municipalities are covered by section 9607(a)(4)(A).[1] *Id.* at 667. CERCLA, however, defines the terms "United States" and "State" as follows:

> to include the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction.

42 U.S.C. § 9601(27).

The court finds that the City is not a "state" for purposes of CERCLA, and that, therefore, the City has the burden to show that its response actions were consistent with the NCP. Under the plain language of the statute, section 9607(a)(4)(A) only applies to the federal government or to states. Municipalities are not considered states under the CERCLA definition. 42 U.S.C. § 9601(27). As the court found in *Stepan Chemical,*

---

1. Both sides cite *Ohio Manufacturers' Ass'n v. City of Akron,* 801 F.2d 824 (6th Cir.1986), *cert. denied,* 484 U.S. 801, 108 S.Ct. 44, 98 L.Ed.2d 9 (1987), to support their positions concerning the status of the City. The court, however, finds that while commenting on the *Drew* case, the Sixth Circuit provides no firm basis for indicating how it may decide this CERCLA dispute. *Id.* at 828–29.

"there is simply nothing in the statute to suggest that Congress intended to allow municipalities to recover their response costs by proceeding under section [9607(a)(4)(A)] rather than by proceeding as a private party under section [9607(a)(4)(B)]."[2] *Id.* at 1488. Furthermore, it appears from the facts of this case that the City was acting as a market participant, rather than a governmental body protecting its citizens, in its dealings with the sale and later cleanup of the site. Because of its contractual relationship with Freezer Services, the City acted to remedy the site. The court finds that this role differs greatly from the role of the federal government and of the states in seeking to remedy waste sites contemplated under section 9607(a)(4)(A) and (C). Thus, because the City is not a state as defined by CERCLA, and because it acted as a market participant, the City has the burden of showing that its actions were consistent with the NCP.

### C. Classification of Response Activity

The court must also determine whether the action by the City was a "removal" or a "remedial" action.[3] The distinction is important because the type of action determines the nature and complexity of the regulations governing the City's compliance with the NCP.[4] Remedial actions are subject to a much higher degree of regulation than that required of removal actions.

The City argues that its conduct amounted to removal activity, and is thus governed by the less stringent regulations covering such activity. The court finds, however, that the City's actions amount to a remedial action. Removal actions are short term responses to imminent threats to the public safety or the environment. They are to be taken "in response to an immediate threat to the public welfare or to the environment." *Amland Properties Corp. v. Alcoa,* 711 F.Supp. 784, 795 (D.N.J.1989); *see also Channel Master Satellite Sys., Inc. v. JFD Electronics Corp.,* 748 F.Supp. 373, 384–86 (E.D.N.C.1990). CERCLA distinguishes the two types because "removal actions were designed to provide an opportunity for immediate action ... without detailed review, where there is no time to safely conduct such review due to the exigencies of the situation." *Channel Master,* 748 F.Supp. at 385–86.

In this case, the cleanup of the site has taken place over the course of five years for the first phase of the operation, and has taken three years and is ongoing in the case of the second phase of the construction involving the addition. The City has demonstrated no imminent threat to health or safety, and the extended and protracted nature

---

2. Even though the plain language of the statute is conclusive in not classifying municipalities as "states," an examination of the legislative history also demonstrates that there is no support for such a finding, the statements of Senator Lautenberg notwithstanding. *Stepan Chemical,* 713 F.Supp. at 1489 n. 15.

3. CERCLA defines removal actions as

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release.... The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals.

42 U.S.C. § 9601(23). Remedial actions are defined as follows:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes ... neutralization, cleanup of released hazardous substances and associated contaminated materials.

*Id.* § 9601(24).

4. Sherwin–Williams also claims that the actions undertaken by the City at the Freezer Services site do not even constitute either removal or remedial activity, and thus, the costs of the City's actions are not "'necessary' costs" of response as required by CERCLA. The court finds this contention without merit. At least some of the activities taken by the City in cleaning up the site and disposing of the contaminated soil in a landfill fall under CERCLA definition of either a remedial or removal action. *See* 42 U.S.C. § 9601. Whether every cost expended by the City was a necessary cost cannot be determined at this stage of the case. The only issue really before the court is the nature and classification of the City's response.

of the cleanup indicate that the City has engaged in a remedial action. As a result, the court finds that the City's cleanup will be evaluated as a remedial action as defined by section 9601(24) for purposes of determining compliance with the NCP.

### D. Standard for Compliance with the NCP

Before deciding whether the City was in compliance with the NCP, the court must decide what standard to apply in judging the City's compliance. Before 1990, there was an ongoing dispute over whether to require strict or substantial compliance with the NCP. *See, e.g., Channel Master,* 748 F.Supp. at 382–84. In 1990, however, the Environmental Protection Agency ("EPA") promulgated a regulation establishing substantial compliance as the standard. The standard is set forth as follows:

> A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (c)(5) and (6) of this section and results in a CERCLA— quality of cleanup.

40 C.F.R. § 300.700(c)(3)(i). This standard is in effect for all cleanups that were already underway as of April 9, 1990, the regulation's effective date.

Although beginning in 1986, the City's cleanup of the Site was still underway well beyond April 9, 1990. The soil excavated during the first phase of the operation had not even been removed from the site and disposed of at a proper facility before the effective date of the regulation. Additionally, the second phase of the project had barely begun. As a result, the court will examine the City's actions under the 1990 regulations, to see if they were in substantial compliance with the NCP. If the City's deviations from the NCP are "immaterial or insubstantial," then the court must find that the City has achieved substantial compliance. *Id.* § 300.-700(c)(4).

### E. Compliance with the NCP

The court must determine whether the City's actions were in substantial compliance with the NCP. An evaluation of the City's compliance should take into account the following factors:

1. appropriate site investigation and analysis of remedial alternatives;
2. compliance with the scoring, development, and selection criteria for removal and remedial actions;
3. selection of a cost-effective response;
4. opportunity for public comment.

40 C.F.R. § 300.700(c)(5)–(6); *Channel Master,* 748 F.Supp. at 387. Sherwin–Williams alleges that the City's actions are not consistent with the NCP because the City failed to provide any opportunity for public comment, and because it failed to conduct a proper investigation of the site and a sufficient analysis of alternative remedial actions. The court will address each of these claims in turn.

### 1. Public Comment Requirement

■ Federal regulations direct that "private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action." 40 C.F.R. § 300.700(c)(6). Courts have consistently held that failure by a party to provide for the required opportunity for public comment "renders a remedial action inconsistent with the NCP and bars recovery of costs." *Channel Master,* 748 F.Supp. at 389; *see County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1514–15 (10th Cir. 1991); *Gussin Enters., Inc. v. Rockola,* 36 Env't Rep. Cas. (BNA) 1903, 1993 WL 114643 (N.D.Ill.1993) ("the absence of meaningful public participation defeats a claim for recovery for remedial action under the 1990 NCP"); *Amland Properties,* 711 F.Supp. at 801; *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1297. In *Channel Master,* the court found that even under a substantial compliance standard, and even where state regulatory officials were involved in the process, the plaintiff's failure to provide for public comment was inconsistent with the NCP and barred recovery of costs. *Id.* at 389–90, 392–93. Similarly, Sherwin–Williams argues that the City's failure to provide for public comment prevents the City from meeting its burden of

showing that its remedial action was in substantial compliance with the NCP. The court finds that the City's failure to provide an opportunity for public comment was a material and substantial departure from the NCP.

The City contends that the involvement of the MDNR in this case satisfies the NCP's public comment requirement. The City relies on *General Electric Co. v. Litton Business Sys., Inc.*, 715 F.Supp. 949 (W.D.Mo. 1989). In *General Electric*, the court held that "the input of the Missouri Department of Natural Resources serves as a substitute for public comment." *Id.* at 961.

The court finds, however, that state regulatory involvement in the remedial process is not a substitute for the public comment contemplated by section 300.700(c)(6). Public comment means just that, public comment. Negotiations between the City and MDNR officials do not constitute the public comment contemplated by the CERCLA regulations. *See* § 300.700(c)(6)(i)-(v). As section 300.430(f)(3) more fully explains, the NCP requires that a brief analysis of the proposed plan be published in a major newspaper, that not less than thirty days be allowed for the submission of written and oral comments from the public, and that a public meeting be held during the comment period at or near the proposed cleanup site. *Id.* § 300.430(f)(3)(A)-(E).

The regulations clearly contemplate participation by the general public in decisions that could affect the environmental conditions of their neighborhood. Using state regulators as a substitute for the "public" is contrary to the letter and the spirit of the regulations. Furthermore, as the court in *Amland Properties* pointed out when it rejected state involvement as a substitute for public comment, even where a cleanup is conducted by the EPA or a state agency, a public comment period is required. *Amland Properties*, 711 F.Supp. at 801 (citing 40 C.F.R. § 300.67(d) (1985 NCP)); *see County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1514–15 (10th Cir. 1991) (EPA and state regulators involved in remediation; lack of public comment meant that remedial action was not in substantial compliance); *Amcast Indus. Corp. v. Detrex*

*Corp.*, 779 F.Supp. 1519, 1537 (N.D.Ind.1991) (private party must provide at least some opportunity for public comment). As the Tenth Circuit noted in *County Line*, the 1990 NCP "requires, at a minimum, that a private party attempting to act 'consistent with the national contingency plan' provide an opportunity for public comment on its selection of the response action for the site." *Id.* at 1514. In this case, the City held no public meetings and provided no opportunity for the general public to comment on, or participate in, the decision behind the remedial actions that were taken.

Even if state involvement were a substitute, the involvement of the MDNR in this case did not rise to the level of, and is distinguishable from, the state involvement presented in *General Electric*. In *General Electric*, the plaintiff was required to enter into a consent decree with the Missouri Department of Natural Resources that required compliance with the NCP, held three public meetings where there was prior notice and the public was allowed to attend, and evaluated a wide range of possible alternative remedial actions with state officials. *General Electric*, 715 F.Supp. at 952–54; *see also Channel Master*, 748 F.Supp. at 390. In addition, *General Electric* involved a removal action, not a remedial action.

In this case, however, the City never entered into a consent decree and held no public meetings. Additionally, the City has not presented any facts to support a finding that a wide range of remedial alternatives were evaluated. CERCLA requires that remedial efforts provide for public knowledge and involvement in the selection of a response. The City is unable to demonstrate such knowledge or involvement. Furthermore, the limited involvement of state and local governments presented in this case does not provide a "substantially equivalent" opportunity for public involvement in the choice of remedy. *See* 40 C.F.R. § 300.700(c)(6).

On the sole basis of the City's failure to provide for public comment, the court finds that the City was not in substantial compliance with the NCP. As a result, the City is

unable to recover its costs incurred in its remediation efforts.

## 2. Investigation and Analysis

Even though the lack of public comment alone would bar recovery, the court also finds that the City's investigation and analysis of the remedial alternatives did not meet the standards required by the NCP.

EPA regulations indicate that private parties are to provide for appropriate site evaluation and investigation, as well as an analysis of remedial alternatives. 40 C.F.R. § 300.-700(c)(5)(vii)–(viii). Private parties must substantially comply with the detailed provisions of section 300.430 in order to meet this requirement. Section 300.700(c)(5)(viii) directs private parties to compile a remedial investigation/feasibility study ("RI/FS") before conducting a cleanup. The RI/FS process requires an analysis of the initial threat of the contamination to health, welfare, and the environment. *Id.* § 300.430(d)(1). The investigation must also take into account fifteen factors ranging from hydrogeological concerns to contaminate mobility in deciding the type of remedial action to be taken. *Id.* § 300.430(d)(2)(i)–(vii).

The feasibility part of the RI/FS process involves a detailed analysis of possible remedial alternatives. *Id.* § 300.430(e). The alternatives must undergo a detailed evaluation against a set of criteria. *Id.* § 300.-430(e)(9)(iii)(A)–(I). After evaluation, the RI/FS eliminates, with explanation, those alternatives that are not the most "cost-effective" or that are not "protective of human health" and the environment. *Id.* § 300.-430(f)(ii)(A) & (D).

■ The failure of a party seeking cost recovery under CERCLA to perform an RI/FS, and all the analysis and investigation that it implies, defeats a claim of substantial compliance with the NCP. *See, e.g., Channel Master*, 748 F.Supp. at 387 ("absence of a proper RI/FS defeats a claim of compliance

with the NCP"); *Amland Properties Corp. v. Alcoa*, 711 F.Supp. 784, 797–801 (D.N.J. 1989); *Versatile Metals v. Union Corp.*, 693 F.Supp. 1563, 1582 (E.D.Pa.1988).

■ The court finds that the City is unable to show that its response actions were in substantial compliance with the NCP as they relate to the remedial investigation and analysis of alternatives. The City did not conduct an RI/FS. The 1989 treatability proposal and the 1990 work plans submitted to the MDNR by the City do not substantially comply with NCP requirements. The City has not demonstrated that it developed, in any detail, alternatives to the methods it chose.[5] The work plan merely established *the* method to be used. Simple variations or adjustments to the same remedial procedure, as reflected in the amendments to the work plan, do not amount to alternatives. Thus, there is no documentation of the consideration of other remedies on the part of the City. *See Channel Master*, 748 F.Supp. at 389 (alternatives must be considered in "detail"); *Amland Properties*, 711 F.Supp. at 800–01 (NCP inconsistency partly based on lack of documentary support for reasoning behind decision among alternatives). "Cursory examination and rejection of alternatives" is not enough to satisfy section 300.-430(e). *Channel Master*, 748 F.Supp. at 389.

The documents submitted by the City in an attempt to demonstrate compliance with the NCP are not sufficient. The City has failed to document any attempt to evaluate the threat to the public and the environment of the contaminated soil. No detailed analysis of remedial alternatives and cost effectiveness appears to have been undertaken. The City's "Remedial Action Procedure" for the second phase of construction on the Site submitted to the MDNR in October 1990 (later amended twice), does not substantially comply with the requirements of the NCP as set forth above. It provides a work plan, but it does not analyze remedial alternatives, the

---

5. The City claims that the deposition testimony of Charles San Juan, an MDNR staffer, shows that it conducted an adequate remedial investigation. The court finds, however, that the City's investigation did not substantially comply with requirements of the NCP delineated in this section of the

court's opinion. Mere approval of the City's work plan by way of a check list does not meet the dictates of section 300.430(b)–(f) requiring a detailed and documented analysis of the various factors and alternatives.

threat to public health or the environment, or the cost effectiveness of the plan. As a result, the court finds that the City did not substantially comply with the RI/FS requirement.[6]

Because the City did not conduct an adequate investigation of the possible remedial alternatives and did not perform an RI/FS, the court concludes that the City's remedial action was not in substantial compliance with the dictates of the NCP.

### F. Conclusions

The court finds that the actions by the City in remediating the Freezer Services site were not in substantial compliance with the NCP.[7] Sherwin–Williams has demonstrated that the City will be unable to meet its burden of showing that its actions were consistent with the NCP as required by section 9607(a)(4)(B). The City failed to provide adequate opportunity for public comment and failed to perform the adequate investigation and analysis of the site and possible alternative methods of remediation as directed by 40 C.F.R. § 300.700(c). The City's failure in either regard is sufficient to constitute a material and substantial inconsistency with the NCP.[8] Because CERCLA requires that private parties demonstrate their substantial compliance with the NCP, and because the City cannot show such compliance, the court will grant plaintiff's motion for summary judgment as to the City's claims under CERCLA.

### IV. Supplemental Jurisdiction

The court's jurisdiction in this case was premised upon the federal question presented by CERCLA. 28 U.S.C. § 1331; 42 U.S.C. §§ 9607 and 9613. Additionally, the court exercised its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over those state law claims involving MERA. Because the court will grant plaintiff's motion for summary judgment on the federal claim, the court will exercise its discretion and dismiss the remaining state claims pursuant to section 1367(c)(3). *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). These state law claims under MERA are already the subject of state court litigation, and the court finds no reason to interfere with, or duplicate, the state court's adjudication of a matter of complex state regulatory law where there are no federal claims remaining to be decided by this court.

### *ORDER*

**NOW, THEREFORE, IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECLARED** that defendant City of Hamtramck has not incurred costs that are recoverable under CERCLA in its cleanup of the Freezer Services site. As a result, all counterclaims, cross-claims, and third party complaints presented by defendants premised upon recovery of costs under CERCLA are **DISMISSED** on the merits.

**IT IS FURTHER ORDERED** that plaintiff's cause of action in Count III of its complaint, premised upon state law, is **DISMISSED** without prejudice.

**IT IS FURTHER ORDERED** that all counterclaims, cross-claims, and third party complaints presented by defendants prem-

---

**6.** The City's treatability plan done by NTH Consultants, Ltd. was not put together until late 1989. Excavation and stockpiling at the Freezer Services site had already been ongoing since 1986. In addition, the treatability plan does not demonstrate substantial compliance with the NCP.

**7.** The City contends that plaintiff's motion is premature given the fact that discovery will not close until June 1994. Although discovery will not be completed for some time, the issue to be decided, compliance with the NCP, is ripe for decision. The City has had a full and fair opportunity to present the actions that it took in remediating the Freezer Services site. Additional discovery could not reveal more to the City about its own remediation efforts.

**8.** The City may claim that future costs involved in the remaining portion of the cleanup could be consistent with the NCP. The court finds no merit in such an assertion. The only reason that the entire cleanup has not been completed is because of a lack of funds. If the City were to find sufficient resources tomorrow to complete the job, the remedial action that it has already chosen and nearly fully implemented, would still not be in substantial compliance with the NCP.

ised upon state law claims, are **DISMISSED** without prejudice.

**SO ORDERED.**